IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

CAROL GIBSON,

      Appellant,

v.

STEPHEN KESTERSON, SR.
AND TAMMY JONES, IN HER
OFFICIAL CAPACITY AS
SUPERVISOR OF ELECTIONS
OF LEVY COUNTY, FLORIDA,

      Appellee.

_____/

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NO. 1D15-956

Opinion filed April 6, 2016.

An appeal from the Circuit Court for Levy County.
Stanley H. Griffis, III, Judge.

Beth M. Gordon of The Gordon Law Firm, Williston, for Appellant.

Michael J. Roper and Frank M. Mari of Bell & Roper, P.A., Orlando, for Appellee
Stephen Kesterson, Sr..

PER CURIAM.

      AFFIRMED.

LEWIS and WETHERELL, JJ., CONCUR; MAKAR, J., CONCURS WITH
OPINION.

MAKAR, J, concurring with opinion.

Ramshackle trailers spawned this dispute. As chair of a recall committee, Carol Gibson filed a petition against Stephen Kesterson, Sr., a newly-elected commissioner in the Town of Inglis, Florida, seeking his removal from office for proposing an ordinance that would outlaw dilapidated and uninhabitable manufactured homes in the community. At issue is the trial court's conclusion that the petition was legally insufficient under Florida's recall statute, section 100.361, Florida Statutes (2015).

## I.

Billing itself as the "Gateway to the Gulf," Inglis (pop. 1,325) consists of four square miles in western Levy County, Florida, its southern border abutting the Withlacoochee River, which meanders past neighboring Yankeetown on its way to the coast. Despite its size, Inglis has had its moments in the spotlight. In the summer of 1961, Elvis Presley spent two summer months filming *Follow That Dream* in the area, an event that remains central to the town's identity and push for tourism.[1] In the early 1970s, the ill-fated Cross Florida Barge Canal was jettisoned

---

[1] See Town of Inglis, https://townofinglis.org (last visited Feb. 19, 2016). The plot involves a vagabond family, including Presley, traveling in Florida, which take up residence by building a shanty on a vacant riverfront lot. Oddly enough, the movie—part of which was filmed in the Citrus County Courthouse—involves a government official who "considers the squatters' home to be an eyesore and wants to evict them" as well as "two gamblers . . . [who] set up a casino in a

mid-project, abandoning one of its few completed portions at Inglis Lock, thwarting the citizenry's hope of local economic prosperity.[2] And in 2001, the city's long-time mayor, sensing social decline in her community, banned Satan from the town, a proclamation making national and international news.[3]

In 2014, Inglis again attracted attention, this time due to a spat involving citizens who objected to a commissioner's proposed beautification ordinance directed at damaged, uninhabitable, and vacant manufactured dwellings. At a September 2014 meeting, Commissioner Kesterson proposed adopting an ordinance providing that:

> [a]ny manufactured dwelling whose date of construction was 1999 or before would be subject to the following:
>
> Provided said dwelling is damaged and in disrepair or otherwise uninhabitable and/or vacant for 120 days from the date of sited record shall be condemned and removed from the subject property within a period to be determined by order. No replacement of the dwelling with another manufactured dwelling shall be allowed.

---

trailer" nearby. Wikipedia, https://en.wikipedia.org/wiki/Follow_That_Dream (last visited Feb. 18, 2016).

[2] Steven Noll & David Tegeder, Ditch of Dreams: The Cross Florida Barge Canal and the Struggle for Florida's Future 35, 239 (2009) (noting that John Inglis was a local banker and developer during the phosphate boom of the 1890s). A rancorous meeting was held in the Inglis Community Hall in 1971 after President Nixon's decision to halt the project. Id. at 278.

[3] See Rick Bragg, Florida Town Finds Satan an Offense Unto It, N.Y. Times, Mar. 13, 2002, http://www.nytimes.com/2002/03/14/us/florida-town-finds-satan-an-offense-unto-it.html.

2.) Any manufactured dwelling as described above that is damaged and/or requires repair to make it habitable will be subject to Paragraph 1 should the estimate for permitted repairs exceed $500.

Hereafter, these provisions will apply to any manufactured home that has reached its sixteenth year from date of manufacturer [sic].

Robust discussion of the proposal ensued among the commissioners, mayor, town clerk, and citizens concerned about the effect of the proposal on their manufactured homes, including an historic area called Cracker Town where zoning requires that mobile homes, once removed, can only be replaced with fixed dwellings. A major concern was that repair costs in excess of $500 could result in people's homes (some used only for vacations by non-resident out-of-towners) being subject to removal. Ultimately, the commissioners unanimously voted in favor of a resolution that would allow the planning commission to consider the proposal.

Displeased with Commissioner Kesterson's attempt to regulate and potentially condemn older manufactured homes, Ms. Gibson filed a recall petition, which stated:

We, the undersigned registered voters of the Town of Inglis/Levy County, are requesting the recall of Commissioner Stephen Kesterson, Sr., on the grounds of misfeasance. By intending to pass specific code enforcement laws and Ordinances, he is violating our 4th Amendment Rights because they will deprive us of our homes, an obvious injurious and wrongful exercise of what he believes he has been given the authority to do, a definite abuse of power.

In response, Commissioner Kesterson filed a defense to the petition stating that he did not violate anyone's rights, that no ordinance was passed, and that the

petition's allegations were untrue. His purpose in making a motion was to discuss abandoned mobile homes, which he believed was a community-wide problem.

On November 18, 2014, the recall committee secured the required number of signatures for the petition and, because Commissioner Kesterson did not resign, the chief judge set a recall election as required by section 100.361, Florida Statutes, prompting Commissioner Kesterson to file a complaint for injunctive and declaratory relief, seeking an emergency hearing to rule on his request to stop the impending election. After a bench trial, the trial court issued a final judgment in favor of Commissioner Kesterson, which provides in pertinent part:

> In this case, the recall petition states the ground of misfeasance, which is defined as performance of a legal act in an improper or illegal manner. . . . Under Florida law, taking a position on an issue is not misfeasance and therefore not legally sufficient to form the basis for a recall petition. . . . While the substance of the position held or expressed regarding the code enforcement laws or ordinances may be disfavored by many in the town, Florida law requires that a recall petition for misfeasance allege that he took action in an improper or illegal way.

Concluding that the recall petition was legally insufficient, the trial court ordered that the recall election "shall not be held and shall be of no force or effect." This appeal followed.

## II.

Electors who become disillusioned with a government official have options: they can speak out and lobby against the official's actions; they can cajole or

pressure the official to resign; they can try to elect someone else next time. They can also seek the removal of the official via a recall election. The power to remove an elected official can be established in a city or county charter or ordinance, or in a state law; the grounds for removal can be narrow or broad. The broadest allows for the removal of an official for any reason: this "so-called purely 'political view' [says] people have the right to vote for the recall of their officials whenever their actions in office are unpopular or irritate a sufficient number to initiate the recall proceeding and a majority of the electorate support the recall group in their views." Joyner v. Shuman, 116 So. 2d 472, 480 (Fla. 2d DCA 1959). See, e.g., Sproat v. Arnau, 213 So. 2d 692, 692 (Fla. 1968) (affirming denial of injunction to stop recall election where city charter specified that the "statement of grounds for recall shall be sufficient in law if the grounds are merely that 'A majority of the electors of the City of Deerfield Beach have lost confidence in the Commissioner or Commissioners' sought to be recalled.'"); Hines v. Dozer, 134 So. 2d 548, 550 (Fla. 3d DCA 1961) (reversing injunction in recall action under city charter where affidavit "alleged ill-advised and possibly unlawful acts which the affiants say resulted in a depreciation of the city treasury"). See also Good v. Common Council of City of San Diego, 90 P. 44, 46 (Cal. Ct. App. 1907) (recall election allowed against city councilman who, in part, "supported a certain ordinance regulating the licensing and sale of liquors in the city of San Diego"). Narrower recall laws run

the gamut from serious felonies to incompetency and poor decision-making as adequate grounds for removal. See Jay M. Zitter, Annotation, Sufficiency of Particular Charges as Affecting Enforceability of Recall Petition, 114 A.L.R.5th 1 (2003) (compiling state and federal cases passing upon the legal sufficiency of circumstances in recall petitions alleging "misfeasance, malfeasance, or the like").

The Inglis charter has no recall provision. Instead, the only remedy available to the town's electors is Florida's recall statute, which states that "[a]ny member of the governing body of a municipality . . . may be removed from office by the electors of the municipality." § 100.361(1), Fla. Stat. This method requires a recall petition, which "shall contain the name of the person sought to be recalled and a statement of grounds for recall." Id. § 100.361(2)(a). A statement (up to 200 words) of the grounds for recall are limited to only the following:

> 1. Malfeasance;
> 2. Misfeasance;
> 3. Neglect of duty;
> 4. Drunkenness;
> 5. Incompetence;
> 6. Permanent inability to perform official duties; and
> 7. Conviction of a felony involving moral turpitude.

Id. § 100.361(2)(d)(1)-(7). As the statute requires, a recall committee was formed (Ms. Gibson designated as its chair), id. § 100.361(2)(c), and a petition alleging misfeasance by Commissioner Kesterson was filed.

Everyone agrees that proper recall procedures were followed, making our task a limited one under the de novo standard of review. See Thompson v. Napotnik, 923 So. 2d 537, 539 (Fla. 5th DCA 2006). Because recall of an elected official is an "extraordinary proceeding" the burden is "on those seeking to overturn the regular elective process to base the petition upon lawful grounds or face the invalidation of the proceedings." Garvin v. Jerome, 767 So. 2d 1190, 1193 (Fla. 2000). We do not "rule on the truth or falsity of the charges against the official." Moultrie v. Davis, 498 So. 2d 993, 996 (Fla. 4th DCA 1986) (citing Bent v. Ballantyne, 368 So. 2d 351, 353 (Fla. 1979)); accord Tolar v. Johns, 147 So. 2d 196, 198 (Fla. 2d DCA 1962) ("The reasons for recall whether true or false do not affect the proceeding. Their truth or sufficiency is for determination by the electors alone."). Instead, we address only whether the conduct alleged in the petition was legally sufficient to establish misfeasance, a purely legal question. Moultrie, 498 So. 2d at 996 ("This court's sole function in the case at bar is to review the petition to determine whether the facts alleged in the recall petition are sufficient to establish any grounds for recall pursuant to section 100.361(1)(b)."). If so, the trial court's termination of the recall process was error.

Misfeasance is "the performance, in an official capacity, of a legal act in an improper or illegal manner." Id. at 995-96. It contrasts with malfeasance, which is the "performance of a completely illegal or wrongful act[.]" Id. at 995. Here, Ms.

Gibson argues that Commissioner Kesterson's actions, though lawful, "would lead to an unlawful ordinance," one that would—according to Gibson—violate constitutional rights under the Fourth Amendment, which in pertinent part says the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV.

Under the recall statute, a plebiscite is impermissible where the alleged misfeasance by a municipal official consists of lawful actions done in a proper and lawful manner. The recall petition does not allege that Commissioner Kesterson's actions were unauthorized or illegal, Taines v. Galvin, 279 So. 2d 9, 11 (Fla. 1973) ("There were no allegations of actions which were beyond the councilmen's authority or were in any way illegal."), only that the actions, if successful, might affect or have consequences on existing legal rights. In essence, what Ms. Gibson argues—that Commissioner Kesterson's proposal "would, as soon as it was applied, have violated citizens' due process rights"—goes to hypothetical consequences of an unadopted ordinance. But absent improper or unlawful actions (such as violating the public meeting laws), no misfeasance exists. Id. Indeed, the "[l]egitimate or authorized actions of a city councilman, although unpopular, are not adequate to justify a recall." Moultrie, 498 So. 2d at 996. Moreover, merely "intending" to pass an ordinance (as the petition alleges) or to have discussion

about a controversial one is far from misfeasance; most citizens expect their representatives to discuss controversial matters and propose solutions that may require new ordinances or laws. Taines, 279 So. 2d at 11 (charges that "amounted to no more than unpopular actions in regard to controversial issues" are not actionable); see also In re DeBruyn, 774 P.2d 1196, 1198 (Wash. 1989) (en banc) ("Directing that an ordinance be drafted, or directing that the subject be put on the agenda for the next meeting is a matter within the discretion of the council. Elected officials cannot be recalled for appropriately exercising the discretion granted to them by law.").

In the end, Ms. Gibson's dispute with Commissioner Kesterson is a matter of public debate that courts do not resolve. See Taylor v. Thornber, 418 So. 2d 1155, 1156 (Fla. 1st DCA 1982) (stating that "appellee's brief argues at some length about the merits of the allegations in the recall petitions. The merits of the allegations are irrelevant to the issue on appeal"). Her brief says an ordinance was adopted and that "commissioner Kesterson passed a law that would deprive Inglis citizens of their homes." No such ordinance has been located; even if one existed, it would not be a ground for a recall petition absent a statutory basis. "Florida's recall statute is accusatory in nature and requires that a recall petition allege conduct by the public official which would constitute one of the seven grounds for removal." Bent, 368 So. 2d at 353.

A recall statute is a balance: it allows for removal of officials on serious grounds leaving general public dissatisfaction non-actionable.

> The nature of the recall process balances two opposing positions: the democratic ideal of allowing the people to rectify serious mistakes in choosing officials, on the one hand, and the goal of allowing officials to work out their term of office unimpeded by having to defend against a series of recall attempts for trifling reasons, by disgruntled political opponents, and the like, on the other.

Zitter, supra, § 2[a]. As our supreme court noted sixty-five years ago, a community sincerely divided in its sentiments on a controversial issue places an elected official in a damned-if-you-do-damned if-you-don't position.

> As soon as a councilman bec[omes] allied with one group and exert[s] himself in their behalf, the opposing group could, doubtless conscientiously, swear that the official had engaged in activities 'inimical to the best interests of the citizens' simply because they entertained the belief that the wrong course had been chosen.

Richard v. Tomlinson, 49 So. 2d 798, 799 (Fla. 1951). Local governments may choose to adopt recall provisions that allow for removal of officials whom the electorate believes have made poor judgments or in whom they have lost confidence. Florida's recall statute, however, reflects the Legislature's policy judgment that public officials not be "ousted" based on a petition "that contains illegal grounds for recall in express violation of the statute." Garvin, 767 So. 2d at 1193 ("We agree that the public policy underlying the legislative scheme does not mandate that officials who have been duly elected to their positions of responsibility should have to face an extraordinary recall election with every vote

they cast or statement they make."). Thus, Commissioner Kesterson's pursuit of measures that he believes may be in the community's best interests provides no basis for recall under Florida law.

## III.

Because the trial court correctly ruled that the recall petition was legally insufficient, the grant of injunctive relief and its order stopping the recall election should be affirmed.